Angela DELEON, Susan Johnson, Barbara Black, and J.H. on Behalf of Her Minor Child, T.H., Plaintiffs,

v.

**PUTNAM VALLEY BOARD OF EDUCATION, Defendants.**

**No. 03 CIV.10274 CM LMS.**

United States District Court, S.D. New York.

May 10, 2005.

---

Michael H. Sussman, Law Offices of Michael H. Sussman, Goshen, NY, for Plaintiffs.

Steven Charles Stern, Miranda & Sokoloff, LLP, Mineola, NY, for Defendants.

## ORDER AND DECISION OF THE COURT GRANTING DEFENDANT'S MOTION FOR A PROTECTIVE ORDER

MCMAHON, District Judge.

This discovery dispute stems from a complaint filed by several plaintiffs against the Putnam Valley Board of Education, alleging discrimination pursuant to the Fourteenth Amendment, 42 U.S.C. § 1981–a, and 42 U.S.C. § 2000d, *et seq.* Among the plaintiffs is T.H., a former elementary school student at Putnam Valley Elementary School. Part of T.H.'s claim is that she "has been the subject of stereotypic racial targeting by defendant staff, a direct consequence of the district's homogenous staffing policies." She specifically alleges that she has been "subjected to false Child Protective Services reports." Cplt. ¶ 23.

During the course of discovery, plaintiffs have sought the name of the mandated reporter who made a November 22, 2002 report regarding T.H. to Child Protective Services ("CPS"). Defendant asserts that, under New York law, the name of the reporter must be kept confidential and is therefore exempt from discovery.

I am now asked to decide, by way of Defendant's appeal from an order of Magistrate Judge Lisa Margaret Smith and Defendant's subsequent application for a protective order, whether or not the name of the mandated reporter should be kept confidential or produced to plaintiffs' attorney, so that the reporter can be deposed regarding the circumstances of the report. For the reasons stated below, I reverse the Magistrate Judge's previous order compelling disclosure of the reporter's name to the attorneys only and permitting a deposition of the reporter, and I enter a protective order prohibiting the disclosure of the reporter's identity to anyone for any purpose related to this lawsuit.

### Facts

The facts relevant to the discovery dispute presently before the court are as follows:[1]

T.H. was a second grade student at Putnam Valley Elementary School in the 2001–2002 school year. (Exh. B.)[2] On March 22, 2002, the School Assistant Principal, Lisa Levinger wrote to T.H.'s parents to inform them of a "serious situation" in which T.H left the school building without telling anyone after becoming upset with a classmate. (Exh. D.) The letter also referenced other past events with T.H., including a letter T.H. had written to "Mrs. Lane" describing her intent to run away and her departure from

---

1. In addition to the briefs and attached exhibits provided by the parties on the record, I have also reviewed *in camera* the unredacted March 23, 2002 report as well as affidavits of the school officials involved in making the November 22, 2002 report (including the actual reporter).

2. All references to Exhibits are to exhibits attached to the Declaration of Steven C. Stern, dated December 20, 2004, unless otherwise noted.

class that same day without permission. (*Id.*) The letter also said that T.H. occasionally referenced "the devil" when explaining her behavior and that T.H. threatened to run away from home. (*Id.*) The letter informed T.H.'s parents that the school psychologist, "Miss Caci," will "continue to work with T.H." (*Id.*) While in second grade, T.H. met regularly with Miss Caci and a group of other students. (Exh. C, T.H. deposition (hereinafter, "T.H.") at 69.)

On or about April 23, 2002, T.H. told Miss Caci that both of her parents hit her with a belt to discipline her. (Exh. B; T.H. at 51–52.) The school nurse checked T.H. by lifting her shirt and examining her back. (T.H. at 55.) T.H. had a four-inch welt on the right side of her back and three inch welt marks on her right and left inner thighs. (Exh. B.) A school official reported this information to the Office of Child and Family Services. (*Id.*)

In response to this report, a caseworker from the Putnam County Department of Social Services ("PCDSS") went to T.H.'s home to investigate the allegations. (Deposition of J.H. at 42, Exh. B.) The PCDSS report filed after the visit stated in pertinent part:

> Mrs. H was interviewed in her home and reported that she did in fact hit her daughter on the buttocks with a belt three times as a result of T.H.'s misbehaving in school. Mrs. H reported that this is her form of discipline and she will continue to punish her daughter in this manner when she misbehaves. Mrs. H denies that she struck her daughter in the back

> .   .   .   .   .

> T.H. reported that she was punished by both parents for the same school incident and stated that she was hit by both parents. T.H. also reports that she is beat by her parents all the time all over her body.

> .   .   .   .   .

> Mr. Horne refuse to be interviewed. T.H. did sustain an abrasion to her back.... There was no redness or swelling to the area and looked like a scratch mark, unable to determine age of injury.

> .   .   .   .   .

Due to lack of credible evidence to substantiate the allegations, this report is determined to be unfounded.

Exh. B.

According to the PCDSS file, on July 26, 2002, someone at CPS conducted a safety assessment at T.H.'s home. (Exh. B.) The report stated:

> Mr. and Mrs. H refused to cooperate with the investigation although Mrs. H denies that she injured her daughter from hitting her with a belt. Mrs. H reported that she will continue to punish her daughter in this manner.

Exh. B.

A second report was made by a school official to CPS on November 22, 2002 (the "second report"), alleging inadequate guardianship by T.H.'s parents. (Exh. B.) This second report states in relevant part:

> T.H. got in trouble in school and she was told that her parents would be called and notified about her behavior in school. The child started crying because she was scared that her parents would hurt her for getting into trouble in school. The child was too scared to say what happens at home because she had been threatened by her mother not talk about the home situation.

Exh. B.

According to the PCDSS file, later that same day, CPS officials and "Law Enforcement" went to T.H.'s home unannounced. (Exh B.) Mr. and Mrs. H refused to talk to CPS about how they discipline their children; Mrs. H stated that she was a Seventh Day Adventist, the Sabbath had begun at sundown, and she could not discuss such things on the Sabbath. (*Id.*) T.H. and her sister were interviewed and reported that "their parents do not use physical discipline." (*Id.*) Aside from a small band-aid on T.H.'s upper lip (possibly caused by T.H.'s trying to shave her upper lip in the shower), no other marks or injuries were observed on either of the sisters. (*Id.*)

CPS's records reflect that they visited T.H.'s home again on December 19, 2002 and that they met with T.H. at school on January 8, 2003. Following these meetings, CPS con-

cluded that the report against Mr. and Mrs. H for inadequate guardianship was unfounded. (Exh. B.)

**Prior History**

This case was filed by plaintiffs on December 30, 2003. The case was referred to Magistrate Judge Smith for general pretrial purposes—including discovery—by a March 3, 2004 order of this Court.

On May 28, 2004, at a hearing before Judge Smith—following oral arguments and *in camera* review of the documents—Judge Smith ruled that a report of suspected child abuse by a school official, dated April 23, 2002 (the "first report"), be produced to plaintiff's counsel, but with the limiting instruction that the report be "produced for attorneys' eyes only." (Exh. G.) Judge Smith also permitted the plaintiff to take "brief depositions" not more than four hours—of both of the mandated reporter and the other person mentioned in the report. (*Id.*) Judge Smith further ruled that these depositions should be attended only by counsel, and that following these depositions, there would be a subsequent order of the court regarding whether or not further revelation of this information should be had. (*Id.*)

Defendant appealed the Magistrate Judge's ruling to this Court pursuant to Fed. R.Civ.P. 72 by a letter dated June 7, 2004. On December 20, 2004, defendant petitioned this court for a protective order pursuant to Fed.R.Civ.P. 26(c) [3] and N.Y. Social Services Law §§ 422(4)(A) and 442–(a)(4), protecting the confidentiality of all individuals who reported allegations of suspected child abuse or maltreatment.

Plaintiffs' Memorandum of Law, dated December 28, 2004, clarifies that the Complaint does not allege that the April 23, 2002 "first report" was an instance of racial discrimination and that "it is not critical to confirm/learn the identity of that reporter." Plaintiff's Memorandum of Law at ¶ 5.

Therefore, plaintiffs now seek only the identity of the person who made the second report to CPS on November 22, 2002. *Id.* at 1, 7, 9.

**Discussion**

*New York State Law Protects the Confidentiality of a Mandated Reporter*

In New York State, certain persons, because of their job, are required by law to report to Child Protected Services "when they have reasonable cause to suspect" that a child is being abused or maltreated. *See* McKinney's Soc. Serv. Law § 413(1).[4] Included on the list of "mandated reporters" are: school officials, psychologists, registered nurses, social workers, and day care center workers. *Id.* Furthermore, when a member of a school faculty makes a report, he or she is also required to immediately notify the person in charge of the school who then also becomes responsible to report or cause reports to be made. *Id.*

New York Social Service Law § 422 (" § 422") provides for a statewide central register of child abuse and maltreatment reports. § 422(1). "Reports made pursuant to this title . . . shall be confidential" and they can only be made available to certain enumerated persons, including the "person who is the subject of the report or other persons named in the report." § 422(4)(A)(d).

However, even though the subject of the report (in this case, T.H.'s parents) are entitled to a copy of the report, they are not entitled to know the name of the person who made the report. *Indeed, the statute specifically prohibits the release of the identity of the person who made the report:* "Nothing in this section shall be construed to permit any release, disclosure or identification of the names or identifying descriptions of persons who have reported suspected child abuse or maltreatment to the statewide central register . . . ." § 422(4)(A). Only courts, grand juries, the state commission on quality care

---

3. Defendant's moving papers actually asked for a protective order pursuant to Fed. Civ. P. "26(d)," but since this court knows of no such thing, I will assume that this was a typographical error intended to read "26(c)."

4. Additionally, willful failure to make such a report of suspected child abuse or maltreatment subjects the mandated reporter to being charged with a misdemeanor and civilly liable for the damages proximately caused by such failure. (§§ 420(1) & (2)).

for the mentally disabled, the district attorney, and in some cases a person engaged in bona fide research (where necessary),and certain state and city agencies can receive unredacted copies of reports of suspected child abuse or maltreatment. *Id.* The subject of a report—and perforce, the lawyer for that person—cannot.

Additionally, § 422(7) of the Social Services Law gives the Commissioner the authority "to prohibit the release of data that would identify the person who made the report or who cooperated in a subsequent investigation or the agency, institution, organization, program or other entity where such person is employed or with which he is associated, which he reasonably finds will be detrimental to the safety or interests of such person." The Commissioner, in accordance with § 422(4)(A), does not permit any release, disclosure or identification of the names or identifying descriptions of mandated reporters.

Furthermore, the prohibition on releasing the name of the reporter is consistent with § 422–a(4) of the statute, which permits the disclosure of reports of child abuse by a social services commissioner under certain circumstances, but states that, "Such disclosure shall not identify or provide an identifying description of the source of the report . . . ." § 422–a (4).

Thus, New York Social Service Law § 422 gives the subject of a report of alleged child abuse or maltreatment the right to obtain a copy of the report, but requires that the identity of the person who made the report be redacted and kept confidential.

Additionally, New York Social Service Law § 419 (§ 419) grants immunity to individuals, officials and institutions for making good faith reports and other related actions from any liability, civil or criminal. *Id.* This section also states that if the reporter was acting in discharge of his duties and within the scope of his/her employment, and not out of gross negligence or wilful neglect, the good faith of any such person, official, or institution required to report cases of child abuse or maltreatment "shall be presumed." *Id.*

*State Law Privileges In a Federal Civil Rights Case*

"In a federal civil rights case, a party invoking a state-law privilege 'must make a "substantial threshold showing" that specific harms are likely to result from the disclosure of some of these materials. If such a showing is made, the court must then balance the interests favoring and opposing confidentiality to determine whether the state privilege should be applied.'" *Velez v. Reynolds,* No. 02 Civ. 8315, 2003 WL 22126962, at *2 (S.D.N.Y.2003) (quoting *Morrissey v. City of New York,* 171 F.R.D. 85, 92 (S.D.N.Y.1997)). Courts have found that a "substantial threshold showing" has been met where laws enacted to make individuals more willing to come forward—because their identities will be protected—would be frustrated by disclosure. *See e.g., Velez,* 2003 WL 22126962 at *2; *Morrissey,* 171 F.R.D. at 92; *see also Pennsylvania v. Ritchie,* 480 U.S. 39, 60–61 n. 17, 107 S.Ct. 989, 1003, 94 L.Ed.2d 40 (1987) ("The importance of the public interest at issue in this case is evidenced by the fact that all 50 States and the District of Columbia have statutes that protect their official records concerning child abuse").

In this case, the state's compelling interest in keeping confidential the identities of school officials who report suspected child abuse, would be frustrated if this "confidential information" had to be disclosed upon demand by a § 1981 claimant. *See Ritchie,* 480 U.S. at 60–61, 107 S.Ct. 989. "Neither precedent nor common sense requires such a result." *Id.* at 61, 107 S.Ct. 989.

*Balancing of Interests Favors Protecting Confidentiality*

The factors to be examined in balancing state privacy laws in the context of federal discovery were set out in *King v. Conde,* 121 F.R.D. 180, 190–96 (E.D.N.Y.1988), which dealt with the disclosure of police personnel records. In *King,* the factors disfavoring disclosure included: the threat to the safety of the reporting officer, the invasion of the privacy of the reporting officer, the weakening of law enforcement programs or procedures, the chilling of police investigative candor, the chilling of citizen complainant candor, and state privacy law. *Id.* at 190–94.

By analogy, in this case, factors disfavoring disclosure of the reporter's identity would include: the threat to the safety of the reporter (by the subject and alleged abuser), the weakening of the suspected child abuse reporting system, the chilling of the mandated reporter candor, and state privacy law. The factors favoring disclosure are the relevance of the material to the plaintiff's case, the importance of the material to the plaintiff's case, the strength of the plaintiff's case, and the importance to the public interest in releasing the information. *Id.* 194–96.

### 1. *Factors Disfavoring Disclosure*

The applicability of § 422's requirement that the identity of mandated reporters be kept confidential to a case involving federal claims and a balancing of these factors was recently considered in *Velez v. Reynolds*, No. 02 Civ. 8315, 2003 WL 22126962 (S.D.N.Y. 2003). The court found that the interests favoring confidentiality of the mandated reporter greatly outweighed the plaintiff's right to fully develop his federal claims through discovery and therefore held in favor of non-disclosure. *Id.* at *3.

In *Velez*, a person, identified by the court as "X," called in four reports to the State Central Register concerning suspected inadequate parenting of a six years old student by his mother. *Id.* at *1. The reporter's name became known to the plaintiff's attorney, because it inadvertently appeared in a document produced to him by the Child Development Support Corporation ("CDSC") who accidentally failed to redact X's name from all the documents. Defendant petitioned to have X's name unredacted in all documents and plaintiff petitioned the court for a protective order to keep X's name confidential and to have it removed from all documents. The Judge granted the request for a protective order and directed all parties and attorneys to (a) refer to the source solely as "X" in all papers directed to the court, (b) keep X's name and identifying descriptions in strict confidence, and (c) redact X's name and identifying descriptions from any and all documents filed with the Court. *Id.* at *2. The Court found that the "balance of interests weighs heavily in favor of restoring con-fidentiality to the maximum extent possible." *Id.* at *3.

Plaintiffs argue that *Velez* should be distinguished because the defense attorney had confirmed that X was the only source of the reports to the CDSC and therefore, the "plaintiffs are suffering no harm from the fact that defendants redacted X's name on the rest of the documents." *See* Plaintiffs' Response Brief at 8 (quoting *Velez*, 2003 WL 22126962, at *2). Plaintiffs assert that, unlike *Velez*, in this case, non-disclosure of the reporter's name will cause litigation related harms because plaintiffs do not know the reporter's identity and without it they "cannot develop their claims or complete discovery." *Id.* at *9.

However, in *Velez*, the court's basis for granting plaintiff's request for a protective order over defendant's request to unredact X's name from the documents was not the fact that X's name had already been revealed to plaintiff. Rather, the court stated that the inadvertent disclosure had given plaintiff's counsel an "undeserved advantage of knowing X's name" prior to deposing a case worker. *Velez*, 2003 WL 22126962, at *4. The plaintiff in *Velez* should never have learned the identity of the reporter. Recognizing this, the court did everything that it could to restore "confidentiality to the maximum extent possible." *Id.* at *3.

■ Furthermore, the very idea that the plaintiffs in this case need the identity of the school official who made the report in order to make out a case of discrimination, underscores the reasons why reporters have been shielded from liability for false reports. If a person who was the subject of an unfounded report could get around the statutory prohibition against disclosure of the reporter's name merely by alleging that discrimination rather than genuine suspicion motivated the original report, the legislatively-mandated protection for the reporter would not be worth the paper on which it was written.

The New York State Office of Children and Family Services ("OCFS") issues a Summary Guide for Mandated Reporters in New York State. (Exh. E.) In addition to explaining that mandated reporters—such as school

officials—are required to report suspected child abuse, and explaining what reasonable grounds for suspicion are, the guide also assures them that state law protects mandatory reporters by protecting their confidentiality. (Exh. E.) It explains:

> The Social Service Law provides confidentiality for mandated reporters and all sources of child abuse and maltreatment reports. OCFS and CPS are not permitted to release to the subject of the report any data that would identify the source of a report unless the source has given permission to do so. Information regarding the source of the report my be shared with court officials, police and district attorneys, but only in certain circumstances.

(Exh. E.)

Because the confidentiality law is plainly spelled out in the guide, this guarantee of confidentiality may be relied upon by school officials when they make reports of suspected child abuse to CPS. If federal courts could routinely preempt this state law and allow the identity of mandatory reporters to be released, school officials, as well as other mandatory reporters, may be less likely to come forward and report these allegations. Furthermore, it would allow plaintiffs' attorneys to use federal claims as a means of avoiding the state confidentiality laws that make such information otherwise privileged. Such a chilling effect on the reporting of suspected child abuse would only serve to endanger the children that these laws were specifically designed to protect, and could result in litigation that abused the courts as well as the reporters.

As stated in *Velez,* there is "a strong interest to assure future witnesses to child abuse 'that they may speak to [ACS] without fear of general disclosure.'" *Velez,* 2003 WL 2216962, at *3 (quoting *Ritchie,* 107 S.Ct. at 1003); *see also Pearson v. Miller,* 211 F.3d 57, 70 –71 (3rd Cir.2000)("[T] the importance of protecting those who file child abuse reports is clear. It is essential that people be encouraged to make such reports, and confidentiality is a valuable tool to that end."); *Farley v. Farley,* 952 F.Supp. 1232, 1240 (M.D.Tenn.1997) ("Without question, the investigation and resolution of incidents of child abuse is one of the most important regulatory objectives that a state may undertake."). The affidavit of the November 22, 2002 mandatory reporter—which I reviewed *in camera*—specifically states, "I am concerned that the disclosure of my identity in this case, and now the possibility of such disclosure in future cases, subjects me to retribution by the subjects of such reports." (Affidavit of November 22, 2002 Mandatory Reporter, dated May 6, 2005.) I find that assertion to be credible.

Allowing the name of the mandatory reporter to be released would create a possible threat to the safety of the reporter (by the subject and the alleged abuser) and, no doubt, lead to the chilling of mandated reporter candor. Such a scenario would have the most undesirable effect of weakening of the suspected child abuse reporting system and frustrating the state privacy laws specifically designed to better protect those children.

### 2. *Factors Favoring Disclosure*

On the other side of the scale are the factors that favor the disclosure of the mandated reporter's identity to plaintiffs' attorney so that he can depose the reporter. Plaintiffs argue that by not being able to question the school reporter about the circumstances of the November 22, 2002 report, they cannot develop their claims and conduct complete discovery.

As an aside, the argument raised by plaintiffs' in their brief that confidentiality of the identity of the mandatory reporter has been waived because the reporter has voluntarily disclosed his or her identity to J.H. is without merit (which in fairness, however, was made by plaintiffs' attorney without the benefit of all of the facts). Having reviewed *in camera* the affidavit of the mandatory reporter, and without saying more than is necessary (in the interest of protecting the identity of the reporter), the reporter has made no statement that would waive his/her right to confidentiality under §§ 422(4)(A) and 442–(a)(4).

In weighing the factors that favor disclosure—relevance of the material to the plain-

tiff's case, the importance of the material to the plaintiff's case, the strength of the plaintiff's case, and the importance to the public interest in releasing the information—these factors provide little reason to reveal the reporter's identity.

Under § 419, the reporter and the school (and the school board) are immune from any liability, civil or criminal, that arise from the good faith discharge of their required duty to report allegations of suspected child abuse or maltreatment. *Id.* And such good faith is presumed absent a showing of willful misconduct or gross negligence. *Id.* Federal courts have relied on this immunity in dismissing causes of action for racial discrimination and other claims relating to the reporting of suspected child abuse. *See, e.g., Phifer v. City of New York,* 99 Civ. 4422, 2003 WL 1878418, at *6–8 (S.D.N.Y.2003) (dismissing a § 1983 claim of racial discrimination in relation to the reporting of alleged child abuse and maltreatment because reporters were immune under § 419); *Preston v. New York,* 223 F.Supp.2d 452, 470–72 (S.D.N.Y.2002) (applying qualified immunity afforded by § 419 to dismiss a § 1983 claim against police officers who reported alleged child abuse).

Here, the allegation is that a school official, while in the course of discharging his/her duties, reported a case of alleged child abuse or maltreatment. The only question is whether the Complaint alleges that the mandated reporter did so in bad faith.

The deposition testimony of T.H. admits sufficient facts to conclude that the mandatory reporter did not act in bad faith. T.H. stated in her deposition that both of her parents discipline her by hitting her with their hands on her back (T.H. at 65) and with a belt "on [her] thighs on [her] back and on [her] butt" (T.H. deposition at 51–52), that when her parents hit her with a belt it leaves marks on her skin—"wel[t]s" or "bumps"(T.H. at 52, 66), and that her parents hit her when she gets in trouble at school (T.H. at 51). T.H. also stated that the school nurse lifted her shirt and saw her back (T.H. at 55), that she was afraid to admit to the school psychiatrist that the injuries were caused by her parents because she feared that they would get angry and hit her again

(T.H. at 53), and that on one occasion, she remembered telling the Vice Principal, Mrs. Edelman, that she did not want her to call her parents (though she could not remember whether or not she said that she was afraid) (T.H. at 63).

The November 22, 2002 report alleges inadequate guardianship. The facts before this court tend to show a substantial factual basis for the reporter's suspicion, particularly because of statements that T.H. made to school officials both on that day and in the past. *See Preston, supra,* 223 F.Supp.2d at 472 (citing *Kubik v. New York State Dep't of Soc. Serv.,* 244 A.D.2d 606, 664 N.Y.S.2d 365, 368 (3d Dep't 1997)) (concluding that there can be no bad faith where there is substantial factual basis for a reporter's suspicion of maltreatment of a minor, because the minor reported the abuse to the reporter). In her deposition, T.H. confirmed that she did in fact make all of these statements to school officials. Mandated reporters must act on their reasonable suspicions and the law allows them a degree of latitude to err on the side of protecting children. *See id.* (citing *Isabelle V. v. City of New York,* 150 A.D.2d 312, 541 N.Y.S.2d 809 (1st Dep't 1989)). Since the child has admitted that she told the school officials about actions that could constitute misconduct on her parents' part, the plaintiffs will find it impossible to rebut the presumption of good faith.

Furthermore, the Complaint does not contain any specific allegations of bad faith on the part of any of the school officials or mandatory reporters. At a minimum, before breaching the privacy provided to mandated reporters by statute, a plaintiff ought to be able to offer some evidence of bad faith independent of the identity of the mandated reporter. If a plaintiff needs to learn the reporter's identity in order to make a case, then the complaint alleging discrimination was filed without foundation, in a fishing expedition to acquire ammunition not otherwise available to a litigant.

The fact that the CPS decided, after investigation (during which the child said different things to CPS than she said at her deposition in this action), that there was insufficient evidence of inadequate guardianship does not

mean that the report was given in bad faith. *See Preston, supra,* 223 F.Supp.2d at 472. In light of the child's deposition testimony, it is impossible to infer bad faith on the reporter's part—which means the claims against the district arising out of the November 22, 2002 report will have to be dismissed.

Because there is little chance of this claim succeeding, two other factors that could favor disclosure—relevance and importance of the material to the plaintiffs' case—are moot. The last factor, the importance to the public interest in releasing the information, actually weighs against disclosure in this case, because—as evidenced by the laws protecting the confidentiality of reporters of child abuse in all 50 states—the public interest would be best served by the identity of the reporter remaining confidential.

### 3. *Balance Favors Confidentiality*

Therefore, in balancing the factors that favor disclosure against those that counsel against it, I find that the balance favors maintaining the confidentiality of the mandatory reporter's identity. The greatest weight in this case must be given to protecting the identity of the reporter and therefore maintaining confidence in the anonymous reporting system of suspected child abuse. Furthermore, based on the facts before the court, plaintiffs have a minimal likelihood of success on this claim, because immunity will likely attach to the defendants. I therefore hold that the New York State laws protecting the confidentiality of the mandatory reporter—Social Services Law §§ 422(4)(A) and 442–(a)(4)—applicable in this case, and issue a protective order requiring the identity of the mandatory reporter and the identity of any persons who reported to the mandatory reporter in the April 23, 2002 and November 22, 2002 reports be kept confidential.

### *Appointment of Guardian Ad Litem*

Because I ruled that the identity of the mandatory reporter and the identity of any persons who reported to the mandatory reporter in the CPS reports be kept confidential, I need not appoint a *guardian ad litem* at this time.

This constitutes the decision and order of this court.

